UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JLT SPECIALTY INSURANCE SERVICES INC.,

Plaintiff,

-against-

NFP PROPERTY & CASUALTY SERVICES, INC.,

Defendant.

Case No.: 19-cv -3921

**COMPLAINT**

Plaintiff JLT Specialty Insurance Services Inc. ("JLT") as for its Complaint against Defendant NFP Property and Casualty Services, Inc. ("NFP") hereby alleges as follows:

## SUMMARY OF THE ACTION

1.      JLT brings this action to protect its customers, goodwill, and confidential information and prevent further injury to its business interests resulting from the unfair competition and malicious conduct of NFP and the thirteen recent hires it wrongly lured away from JLT.

2.      Between Wednesday, March 20, 2019 and Friday, March 22, 2019, twelve employees in JLT's Real Estate and Property Practices resigned their employment, without prior notice, immediately joined NFP, a competitor in the insurance industry, and began unfairly competing with JLT.

3.      On the following Tuesday, March 26, 2019, a thirteenth employee and a member of JLT's Real Estate Practice resigned his employment, without prior notice, immediately joined NFP, and began unfairly competing with JLT.[1]

4.      Each of the thirteen Breaching Employees was employed by JLT in a position of trust and confidence, and, accordingly, owed a fiduciary duty and a duty of loyalty to JLT.

---
[1] These thirteen separated employees collectively are referred to in this Complaint as the "Breaching Employees."

5.	Eleven of these thirteen Breaching Employees signed Non-Solicitation and Confidentiality Agreements agreeing not to disclose JLT's Confidential Information and/or Trade Secrets, including information about JLT's clients and client relationships.

6.	Ten of those eleven employees also agreed that, for a period of twelve months following their separation from employment with JLT, they would not solicit, divert, take away or do business with JLT's clients or prospective clients with whom they were involved during the final twelve months of their employment with JLT.

7.	Those ten employees also agreed that, for a period of twelve months following their separation from employment, they would not to solicit, induce or recruit (either directly or indirectly) any JLT employee with whom they worked during the final twelve months of their employment with JLT.

8.	An eleventh employee signed a Non-Solicitation and Confidentiality Agreement agreeing that she would not solicit certain of JLT's clients, prospective clients and employees for a period of two years following her separation from employment.

9.	Upon information and belief, some or all of the thirteen Breaching Employees, breached their Non-Solicitation and Confidentiality Agreements, and their common law fiduciary duties by soliciting JLT clients and employees with whom they worked while employed by JLT, and by downloading, maintaining and divulging JLT's confidential information to representatives of NFP.

10.	Non-solicitation and confidentiality agreements of the type the individuals signed and breached are common in the insurance industry to protect insurers from unfair competition by competitors.

11.	Indeed, NFP employees also sign Non-Solicitation Agreements. *See, generally, NFP Property & Casualty Services, Inc. v. Lefkowitz*, No. 13-cv-04686 (RMB)(JLC) (S.D.N.Y.)

and *NFP Property & Casualty Services, Inc. v. Tankersley,* Index No. 650557/2014 (Sup. Ct., N.Y. Cnty.).

12.     Thus, NFP knew, or should have known, of the existence of the eleven employees' Non-Solicitation and Confidentiality Agreements.

13.     NFP also knew, or should have known, about individuals breaches of their Non-Solicitation and Confidentiality Agreements and their common law fiduciary duties, which benefited and unjustly enriched NFP.

14.     NFP's blatant and unabated disregard for each Breaching Employee's contractual obligations and fiduciary duties have caused and are continuing to cause malicious, unfair and financial harm to JLT.

15.     JLT seeks redress for NFP's tortious interference, unfair competition and misappropriation of confidential information.

## PARTIES

16.     Plaintiff JLT is a Delaware corporation with its principal place of business located at 225 West Wacker Drive, Chicago, IL 60606. JLT is a wholly-owned subsidiary of JLT Holdings Inc., and an indirect subsidiary of Marsh & McLennan Companies Inc. It is a leading provider of insurance, reinsurance, employee benefits advice and brokerage services.

17.     Defendant NFP is a New York corporation with its principal place of business located at 707 Westchester Avenue, White Plains, NY 10604. NFP is a subsidiary of National Financial Partners Corp. Like, JLT, NFP provides insurance, reinsurance, employee benefits advice and brokerage services.

## JURISDICTION AND VENUE

18.     This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because this is an action between citizens of different states, and the amount in controversy exceeds $75,000 exclusive of interests and costs.

19.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because NFP resides in the district and is subject to the Court's personal jurisdiction.

## FACTUAL ALLEGATIONS

*JLT's Real Estate Practice*

20.     JLT's Real Estate Practice focuses on the insurance and risk management needs of commercial, habitational, residential and industrial property owners, operators, managers, investors and developers.

21.     Beginning in or about August 2015, JLT employed Gary Pestana as an Executive Vice President and Practice Leader of the Real Estate Practice, based in JLT's Los Angeles, CA office.

22.     As Executive Vice President and Practice Leader, Pestana was responsible for, among other tasks, generating new client business and maintaining and growing business with existing clients.

23.     Pestana relied on financial and internal resources from JLT to generate business, service clients and manage client relationships. He developed client relationships by virtue of his employment, and with the support of an experienced team of JLT employees, on whom he relied to carry out his job duties.

24.     On or about August 28, 2015, in connection with the commencement of his employment with JLT, Pestana entered into a Non-Solicitation and Confidentiality Agreement**.**

25.     By signing the Non-Solicitation and Confidentiality Agreement, Pestana acknowledged that: (i) he would be "granted access to [JLT's] confidential and proprietary data," including client pricing, prospect lists, key client contacts and risk assessments; and (ii) the confidential and proprietary data to which he had access is "a valuable property of [JLT]."

26.     Further, by signing the Non-Solicitation and Confidentiality Agreement, Pestana agreed that he would not, either during or after his employment, "divulge [JLT's] Confidential Information and/or Trade Secrets . . . or make use of it for his . . . own purposes or the purposes of another, for so long as such Confidential Information has not fallen into the public domain."

27.     Pestana also agreed that, for a period of twelve months following the termination of his employment, he would not directly or indirectly solicit, "divert, take away or do business with [JLT's] [c]lients or [p]rospective clients," with whom he had "any direct or indirect involvement" during the twelve months prior to his termination of employment, and would not otherwise assist any person, firm or entity in soliciting, diverting, taking away or doing business with those same clients and prospective clients.

28.     Pestana also agreed that, for a period of twelve months following the termination of his employment, he would "not knowingly solicit induce, recruit or make an offer of employment to or assist in the recruitment of or the making of an offer of employment" to any JLT employee who was employed at any time during the twelve months prior to his termination of employment.

29.     Finally, Pestana agreed that at end of his employment with JLT, he would "promptly return . . . all literature, correspondence, memoranda, reports, summaries, manuals, proposals, contracts, documents, computer disks and programs, computer hardware, and other materials which comprise or refer to [JLT's] Confidential Information and/or Trade Secrets."

30.     Other members of JLT's Real Estate Practice, including Dustin Smith, Senior Vice President, Lesa Medeiros, Vice Present and Genevieve Lopez, Account Manager, signed identical Non-Solicitation and Confidentiality Agreements in connection with their commencement of employment with JLT.

31.     Each of these employees reported to Pestana.

32.     Among the many clients Pestana produced during his employment at JLT, with the assistance of JLT's staff and resources, was a residential and commercial property developer engaged in a joint venture to redevelop twenty-two acres of prime real estate in downtown Brooklyn, NY, including 6 million square feet of residential space, 247,000 square feet of retail space, 336,000 square feet of office space and 8 acres of publicly accessible open space ("Client A").

33.     Pestana and his team also developed, with the assistance of JLT's staff and resources, a client relationship with a large, publicly traded real estate investment trust that owns more than 20 million square feet of shopping centers ("Client B").

*JLT's Property & Casualty Practice*

34.     JLT's Property Practice uses technical expertise, market-leading tools and resources, global platform, and carrier relationships to design custom solutions for its clients.

35.     Beginning in or about October 2015, JLT employed Sara Sherman as a Senior Vice President in its Real Estate Practice, based out of San Francisco, CA.

36.     In or about April 2017, JLT promoted Sherman to Executive Vice President and Practice Leader of the Real Estate Practice.

37.     As Executive Vice President and Practice Leader, Sherman was responsible for, among other tasks, producing new client business and maintaining and growing business with existing clients.

38.     Sherman relied on financial and internal resources from JLT to generate business, service clients and manage client relationships. She developed client relationships by virtue of her employment, and with the support of an experienced team of JLT employees, on whom she relied to carry out her job duties.

39.     On or about October 23, 2015, in connection with her commencement of employment with JLT, Sherman entered into a Non-Solicitation and Confidentiality Agreement**.**

40.     By signing the Non-Solicitation and Confidentiality Agreement, Sherman acknowledged that: (i) she would be "granted access to [JLT's] confidential and proprietary data," including client pricing, prospect lists, key client contacts and risk assessments; and (ii) the confidential and proprietary data to which she had access is "a valuable property of [JLT]."

41.     Further, by signing the Non-Solicitation and Confidentiality Agreement, Sherman agreed that she would not, either during or after her employment, "divulge [JLT's] Confidential Information and/or Trade Secrets . . . or make use of it for . . . her own purposes or the purposes of another, for so long as such Confidential Information has not fallen into the public domain."

42.     Sherman also agreed that, for a period of twelve months following the termination of her employment, she would not directly or indirectly solicit, "divert, take away or do business with [JLT's] [c]lients or [p]rospective clients," with whom she had "any direct or indirect involvement" during the twelve months prior to her termination of employment, and would not otherwise assist any person, firm or entity in soliciting, diverting, taking away or doing business with those same client and prospective clients.

43.     Sherman also agreed that, for a period of twelve months following the termination of her employment, she would "not knowingly solicit induce, recruit or make an offer of employment to or assist in the recruitment of or the making of an offer of employment" to any

JLT employee who was employed at any time during the twelve months prior to her termination of employment.

44. Finally, Sherman agreed that at end of her employment with JLT, she would "promptly return . . . all literature, correspondence, memoranda, reports, summaries, manuals, proposals, contracts, documents, computer disks and programs, computer hardware, and other materials which comprise or refer to [JLT's] Confidential Information and/or Trade Secrets."

45. Other members of JLT's Property Practice, including Joshua Forbes, Senior Vice President, Timothy Edwards, Senior Vice President, Margaret Martinez, Assistant Vice President, Jason McCarrick, Assistant Vice President, Hermilia Martinez, Senior Account Specialist and Stephanie Olloqui, Account Manager, signed identical Non-Solicitation and Confidentiality Agreements in connection with their commencement of employment with JLT.

46. Each of these employees reported to Sherman.

47. Sherman and her team worked with Pestana and his team to develop and service Client A and Client B.

***NFP's Corporate Raiding and Unauthorized Taking of JLT's Confidential Information***

48. On or about March 1, 2019, Pestana had lunch with one or more representatives of NFP.

49. Upon information and belief, Pestana discussed the names of his clients and colleagues with NFP.

50. Upon information and belief, following his lunch meeting with NFP, Pestana spoke with one or more members of JLT's Real Estate and Property Practices about moving to NFP.

51. Upon information and belief, other members of JLT's Real Estate and Property Practices also spoke to their colleagues about moving to NFP.

52.     Sherman resigned her employment with JLT effective March 20, 2019, without any advanced notice.

53.     Seven other members of the Property Practice she supervised resigned within 48 hours of Sherman's resignation, including five who resigned on the same day:

| Name | Listed Title | Listed Practice Group | Location | Effective Resignation Date |
|------|--------------|----------------------|----------|---------------------------|
| Edwards, Timothy | Senior Vice President, Property | Property & Casualty | San Francisco, CA | 3/20/2019 |
| Forbes, Joshua | Senior Vice President | Property & Casualty | New York, NY | 3/20/2019 |
| Martinez, Hermilia | Senior Account Specialist | Property & Casualty | San Francisco, CA | 3/20/2019 |
| Martinez, Margaret | Assistant Vice President | Property & Casualty | New York, NY | 3/20/2019 |
| McCarrick, Jason | Assistant Vice President | Property & Casualty | San Francisco, CA | 3/20/2019 |
| Olloqui, Stephanie | Account Manager | Property & Casualty | Los Angeles, CA | 3/21/2019 |
| Nelson, Jessica | Account Manager | Property & Casualty | New York, NY | 3/22/2019 |

54.     Pestana resigned his employment with JLT effective March 21, 2019, without any advanced notice.

55.     Four other members of the Real Estate Practice Pestana led resigned within three business days of Pestana's resignation:

| Name | Listed Title | Listed Practice Group | Location | Effective Resignation Date |
|------|--------------|----------------------|----------|---------------------------|
| Lopez, Genevieve | Account Manager | Real Estate | Los Angeles, CA | 3/22/2019 |
| Medeiros, Lesa | Vice President | Real Estate | San Francisco, CA | 3/22/2019 |
| Smith, Dustin | Senior Vice President | Real Estate | Los Angeles, CA | 3/22/2019 |
| Morcos, Ramy | Vice President | Real Estate | Los Angeles, CA | 3/26/2019 |

56.     All thirteen of the Breaching Employees who resigned between March 20, 2019 and March 26, 2019 from JLT's Real Estate and Property Practices immediately went to work for NFP.

57.     Immediately prior to their resignations, and their return of JLT's phones, laptops and tablets, some or all of the Breaching Employees downloaded and/or uploaded JLT's confidential information to external drives and/or personal cloud storage accounts.

58.     For example, between March 11, 2019 and March 21, 2019, Pestana connected at least four USB drives and an iPhone to his JLT computer and accessed a Dropbox.com account from that computer.

59.     On or about March 14 and 21, 2019, Pestana accessed JLT's files related to Client B, and numerous broker of records letters.

60.     Between March 14, 2019 and March 20, 2019, Sherman connected her iPhone and numerous USB devices and drives to her JLT computer. She also accessed and/or downloaded documents entitled "January_February_2019_Premium_Rate_Report_Summary SMS.pptx," "January_February_2019_Premium_Rate_Report_Real Estate SMS.pptx," and "January_February_2019_Premium_Rate_Report_Property SMS.pptx," and information related to the coverage, losses, renewal presentations and policies of a large hospitality client.

61.     On March 12, 2019, she accessed a document entitled "Forbes Offer JLT.pdf," which, upon information and belief, was the March 1, 2018 employment offer letter from JLT to Josh Forbes. As alleged above, Forbes separated from his employment at JLT on the same day as Sherman.

62.     Between March 20, 2019 and his March 26, 2019 resignation, Ramy Morcos connected at least 6 unique USB drives, an iPhone and an iPad to his JLT computer.

63.     Morcos downloaded to his various USB drives client pricing, audit, loss, risk and coverage information related to numerous JLT clients, including (i) a real estate investment, company based in Los Angeles, California ("Client C"); (ii) a general contracting and construction company in Chino, CA; (iii) a real estate investment and construction company based in Indianapolis, IN; and (iv) a second a real estate investment, management company based in Los Angeles, California.

64.     Using his JLT computer, Morcos also accessed personal Dropbox and Google Drive cloud storage accounts, where, upon information and belief, he uploaded JLT's confidential information to his personal accounts.

65.     Upon information and belief, these employees downloaded and/or uploaded JLT's confidential and propriety information to external drives and/or cloud storage accounts for use in their new jobs with NFP.

66.     Upon information and belief, NFP knew, or should have known, about these downloads and uploads.

67.     Also immediately prior to their resignations, and their return of JLT's phones, laptops and tablets, some or all of the Breaching Employees took steps to cover their electronic tracks and hide their tortious and injurious conduct.

68.     In the final two weeks of their employment, Pestana, Sherman and Morcos each made frequent visits to the temporary file location on their JLT computers, and deleted their Internet Explorer temporary files and browsing histories.

69.     Pestana, Sherman and four other employees (Jessica Nelson, Stephani Ollogui, Maggie Martinez and Jason McCarrick) also wiped the data from their JLT-issued iPhones and iPads.

70.     Additionally, Morcos and Dustin Smith failed to provide JLT with their passcodes, which would allow JLT to access the data on their JLT-issued devices.

***Improper Solicitations of Client A***

71.     Also immediately prior to their resignations, some or all of the Breaching Employees met with JLT clients to solicit business in violation of their contractual obligations and fiduciary duties.

72.     On March 19, 2019, Vincent Zegers, a Senior Vice President in JLT's Real Estate Practice who assisted Pestana and Smith with Client A, emailed Pestana and Smith about Client A. He wrote, in part, "Any update? It's pretty quiet which worries me a bit......."

73.     That day same day, just two days before his resignation and one day before Pestana's resignation, Smith responded "[m]eeting with them tomorrow. W[ill] fill you in after the meeting."

74.     Smith never filled Zegers in, as he promised in his email.

75.     The day after the meeting (March 21, 2019) Client A's Senior Vice President and General Counsel emailed Pestana, Smith, Jessica Nelson and Jason McCarrick confirming his knowledge that the employees were leaving JLT and transitioning to NFP.

76.     He wrote, in part: "Dear JLT Team: I have a hopefully quick request (and apologies knowing that you are swamped with the transition)."

77.     That same day, after Nelson responded to Client A's inquiry, Client A's Senior Vice President and General Counsel joked "Thank you for the Q[I]CK turnaround . . . (They don't do that at Marsh!)," referring to JLT's parent company.

78.     Pestana resigned that day (March 21, 2019).

79.     Smith and Nelson resigned from JLT on the following day (March 22, 2019).

80.     On March 22, 2019, Client A's Senior Vice President and General Counsel sent a letter "confirm[ing] the appointment, on an exclusive basis, [of] NFP Property & Casualty Services, Inc. (NFP) as broker of record effective March 22, 2019." Client A carbon copied Pestana on its letter.

***Client B, Client C and Other Lost Business Resulting from the Breaching Employees' Various Breaches***

81.     Other clients also departed JLT on March 22, 2019 and the days that followed because of the improper solicitations of the Breaching Employees.

82.     On March 22, 2019, Pestana's first day of employment at NFP, at 9:07 a.m., Pestana emailed the Managing Director of Client C a template broker of record letter.

83.     Pestana wrote to Client C's Managing Director, "Just need on your letterhead, signed and returned."

84.     Pestana carbon copied his email to Stephanie Olloqui, who resigned her employment with JLT the previous day, at her new NFP email address.

85.     Pestana also carbon copied his email to Ramy Morcos at ramy.morcos@nfp.com, even though Morcos was employed by JLT until his resignation on March 26, 2019 (4 days later).

86.     By letter dated March 22, 2019, JLT received notification that Client C submitted a broker of record letter to its insurance carrier appointing a new broker.

87.     JLT received the letter regarding Client C less than two weeks after Morcos accessed and downloaded files related to Client C's pricing and coverage information.

88.     Upon information and belief, Client C's new broker is NFP.

89.     Also by letter dated March 22, 2019, Client B's Chief Executive Officer "confirm[ed] the appointment, on an exclusive basis, [of] NFP Property & Casualty Services, Inc. (NFP) as broker of record effective March 22, 2019." Client B carbon copied Pestana on its letter.

90.     Other than the signatures block and the letterhead, the letter from Client B was identical to the letter JLT received from Client A.

91.     Upon information and belief, both letters were drafted by Pestana after he solicited business from both Client A and Client B.

92.     Also on or about March 22, 2019, received notification that a hospitality client in Arizona, who previously was serviced by JLT through the Breaching Employees, submitted a broker of record letter to its insurance carrier appointing a new broker.

93.     Upon information and belief, the Arizona-based hospitality client now works with NFP as its exclusive broker of record.

94.     By letter dated March 27, 2019, JLT received notification confirming that a San Francisco based online direct home seller, who previously was serviced by Sherman, had appointed NFP, "on an exclusive basis . . . as broker of record effective March 27, 2019."

95.     The March 27th letter from the San Francisco client was nearly identical to the letters JLT received from Clients A and B.

96.     Although Sherman provided some services to the San Francisco based online home seller she did not originate or produce the relationship for JLT.

97.     The relationship with the San Francisco based online home seller was generated by Jennifer Schaeffer a Senior Vice President in JLT's San Francisco Office who remains employed by JLT.

98.     On or about April 30, 2019, JLT received a letter notification from a condominium client in Bronx, New York, "confirm[ing] the appointment, on an exclusive basis, [of] NFP Property & Casualty Services, Inc. (NFP) as broker of record effective April 25, 2019."

99.     The letter which was carbon copied to Dustin Smith was nearly identical to the letters JLT received from Client A, Client B and the San Francisco online home seller.

100.    Upon information and belief, the departures of these clients were the result of improper solicitations by one or more of the Breaching Employees, in violation of their Non-Solicitation and Confidentiality Agreements.

101.    Upon information and belief, the departures of these clients were the result of the improper download, use and/or dissemination of JLT's confidential information by one or more of the Breaching Employees, in violation of their Non-Solicitation and Confidentiality Agreements.

102.     NFP knew or should have known of the Breaching Employees' post-employment obligations to JLT at or near the time the Breaching Employees commenced their employment with NFP.

103.     NFP knew or should have known that one or more the Breaching Employees were soliciting on NFP's behalf in violation of their Non-Solicitation and Confidentiality Agreements.

104.     NFP knew or should have known that one or more the Breaching Employees downloaded, used and/or disseminated JLT's confidential information on NFP's behalf in violation of their Non-Solicitation and Confidentiality Agreements.

105.     Upon information and belief, NFP has assisted in or benefited from the Breaching Employees' breaches of their Non-Solicitation and Confidentiality Agreements.

***JLT's Efforts to Abate the Individual Defendants' Breaches***

106.     Between March 25, 2019 and March 27, 2019, Aubrie Ekman, Associate General Counsel for JLT, sent letters to each of the Breaching Employees reminding them of their continuing obligations to JLT, including their obligations to refrain from soliciting certain clients, prospective clients and employees, and their obligations to refrain from copying, using, sharing or disclosing JLT's confidential information.

107.     The Ekman letters also requested that the Breaching Employees return JLT's "materials, documents, or information in any form, paper, electronic, or otherwise, or copies thereof" to JLT and provided an address to which the Breaching Employees could send the materials, documents, or information.

108.     Not one of the Breaching Employees acknowledged receipt of the Ekman letter, nor did any of the Breaching Employees return USB dives or other external media drives used to store JLT information.

109.     On April 26, 2019, attorneys for NFP acknowledged that Pestana and Morcos downloaded files from their JLT computers and/or JLT systems onto USB drives and returned eleven files.

110.     On behalf of Pestana, NFP's attorney returned: (i) a MS PowerPoint presentation prepared for a prospective client in October 2015, outlining capabilities and expertise in construction; (ii) a list of sixteen prospective California based clients; (iii) a compilation of more than 7,000 prospective and former clients, including information about policy renewal dates, premium amounts, submission dates and expiration dates; and (iv) two 2015 invoices showing the insurance premiums paid by a JLT client and the commission percentages paid to JLT.

111.     On behalf of Morcos, NFP's attorney returned: (i) a list of clients (including Clients A, B and C), prospects and former clients assigned to various members of JLT's Real Estate and Property Practices, including Dustin Smith and Morcos; (ii) a template exposure workbook used by members of JLT's Real Estate and Property Practices to summarize client entities and risks; (iii) a property proposal template used by members of JLT's Real Estate and Property Practices to summarize client insurance placements; (iv) a sample timeline for insurance renewals; (v)   a completed template summary of insurance workbook used by members of JLT's Real Estate and Property Practices to track coverage; (vi) a completed workers' compensation net rate analysis used by members of JLT's Real Estate and Property Practices; and (vii) a template property and casualty submission to insurance carriers.

112.     NFP did not return the USB drives Pestana and Morcos used to download these documents.

113.     NFP also did not return documents Morcos downloaded regarding Client C and various other JLT clients (*see* Paragraph 63).

114.    NFP also did not return documents Pestana and/or Morcos uploaded to their personal cloud storage accounts.

115.    NFP did not return USB drives, external storage devices, materials, documents or information from any other Breaching Employee.

### FIRST CLAIM FOR RELIEF
#### (Tortious Interference with Existing and Prospective Business Relationships)

116.    JLT repeats and realleges each and every allegation contained in Paragraphs 1 through 115 of the Complaint as if fully set forth herein.

117.    As a result of their employment with JLT, the Breaching Employees were intimately familiar with, and had detailed knowledge concerning, the business relationships that existed between JLT and certain clients.

118.    Upon information and belief, NFP encouraged each Breaching Employee to utilize JLT's confidential information to solicit JLT's clients, and was motivated by a desire to obtain an unfair advantage in its competition with JLT, and to damage or injure JLT's business, goodwill, reputation, or standing in the marketplace.

119.    Upon information and belief, NFP was aware that eleven of the thirteen Breaching Employee were subject to certain post-employment obligations no later than the time each Breaching Employee commenced employment with NFP.

120.    Upon information and belief, NFP has directly or indirectly received JLT's confidential information, and encouraged, or participated in, its use in order to solicit JLT's clients unlawfully and interfere with JLT's business advantages and prospective economic relations.

121.    JLT possesses a protectable interest in its contracts and relations with its clients, in that it has a reasonable expectation of their continued association with JLT.

122. NFP's conduct was undertaken with malice, or in knowing disregard of or indifference to, the rights and interests of JLT.

123. As a direct and proximate result of NFP's interference, JLT suffered and will continue to suffer extensive irreparable injury, loss of goodwill, harm to its business, and other injury and damages.

124. As a direct and proximate result of NFP's interference, JLT suffered and will continue to suffer damages, which continue to accrue in the form of attorneys' fees and costs related to this litigation, and lost business in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF
### (Tortious Interference with Contract)

125. JLT repeats and realleges each and every allegation contained in Paragraphs 1 through 124 of the Complaint as if fully set forth herein.

126. As a result of their employment with JLT, the Breaching Employees were intimately familiar with, and had detailed knowledge concerning, the business relationships that existed between JLT and certain clients.

127. By recruiting the Breaching Employees and inducing them to breach their Non-Solicitation and Confidentiality Agreements; by inducing, encouraging or helping the Breaching Employees solicit JLT's clients; together with the misappropriation, use and/or disclosure of JLT's confidential information, NFP tortiously interfered with JLT's contractual relationship with each Breaching Employee.

128. Upon information and belief, NFP will profit, has profited, and will continue to profit from the tortious interference with contractual obligations owed by each Breaching Employee to JLT.

129.     As a direct and proximate result of NFP's interference, JLT has suffered and will continue to suffer extensive irreparable injury, loss of goodwill, harm to its business, and other injury and damages.

130.     As a direct and proximate result of NFP's interference, JLT has suffered and will continue to suffer damages, which continue to accrue in the form of attorneys' fees and costs related to this litigation, and lost business in an amount to be proven at trial.

## THIRD CLAIM FOR RELIEF
### (Unfair Competition)

131.     JLT repeats and realleges each and every allegation contained in Paragraphs 1 through 130 of the Complaint as if fully set forth herein.

132.     Upon information and belief, NFP engaged in unfair methods of competition in that it has unlawfully seized, appropriated and utilized unfair advantages in its competition with JLT from each Breaching Employee's breach of his or her Non-Solicitation and Confidentiality Agreements; each Breaching Employee's breach of his or her fiduciary duty and duty of loyalty, and NFP's interference with JLT's business, advantages and prospective economic relations and contracts, all of which are more fully set forth above.

133.     The aforementioned conduct has resulted in the pirating of JLT's confidential information.

134.     Upon information and belief, NFP was and is driven by unlawful predatory motives and malice, or acted in knowing or reckless disregard of the rights and interests possessed by JLT in its attempts to obtain an unfair advantage over JLT and to damage or injure JLT in the industries within which NFP competes with JLT.

135.     Upon information and belief, each Breaching Employee acted and is acting on behalf of NFP, as set forth above, and in connection with such conduct the NFP was, and is,

driven by unlawful predatory motives and malice toward JLT; or acted in reckless disregard for the rights and interests of JLT, in its respective attempts to obtain an unfair competitive advantage over JLT and to damage or injure JLT in the industries within which NFP competes with JLT.

136. As a direct and proximate result of NFP's conduct, JLT has been damaged in that, by way of illustration and without limitation: (1) the name, reputation and goodwill of JLT has been damaged; (2) a direct competitor has secured JLT's confidential information; (3) JLT has lost business, in an amount unable to be ascertained at this time; and (4) the damages suffered by JLT is expected to continue and multiply by reason of ongoing breaches by the Breaching Employees on behalf of NFP.

137. As a direct and proximate result of NFP's conduct, JLT has suffered and will continue to suffer extensive irreparable injury, loss of goodwill, harm to their business, and other injury and damages.

138. As a direct and proximate result of NFL's unlawful competition, JLT has suffered and will continue to suffer damages, which continue to accrue in the form of attorneys' fees and costs related to this litigation, and lost business in an amount to be proven at trial.

**FOURTH CLAIM FOR RELIEF**
**(Misappropriation of Confidential Information)**

139. JLT repeats and realleges each and every allegation contained in Paragraphs 1 through 138 of the Complaint as if fully set forth herein.

140. As senior employees of JLT, each Breaching Employee learned or had access to JLT's confidential information.

141. Upon information and belief, each Breaching Employee has used or disclosed, or threatens to use or disclose, JLT's confidential information.

142.     Upon information and belief, NFP induced, procured and/or assisted each Breaching Employee in the misuse, misappropriation and disclosure of JLT's confidential information.

143.     Upon information and belief, NFP, and the Breaching Employees on behalf of NFP, are presently misappropriating JLT's confidential information, and using such information to the detriment of JLT.

144.     As a direct and proximate result of NFP's conduct, JLT has suffered and will continue to suffer extensive irreparable injury, loss of goodwill, harm to its business, and other injury and damages.

145.     As a direct and proximate result of NFP's conduct, JLT has suffered and will continue to suffer damages, which continue to accrue in the form of attorneys' fees and costs related to this litigation, and lost business in an amount to be proven at trial.

**WHEREFORE**, JLT respectfully requests that judgment be made and entered against NRL and in favor of JLT, as follows:

(a) Enjoining and restraining NFP, and any person or entity acting in concert with NFP or its supervision, through March 22, 2020, and as extended during any period that the Breaching Employees have breached their obligations to JLT, from, soliciting or servicing, or inducing not to place business with JLT, any clients of JLT with whom any Breaching Employee had contact, or about whom any Breaching Employee obtained confidential information, or for whom any Breaching Employee was responsible for making (or assisting or supervising the making of) sales to, or performing or providing (or assisting or supervising the performance or provision of) services or products on behalf of, JLT, during the last twelve months of his or her employment;

 (c) Enjoining and restraining NFP, and any person or entity acting in concert with NFP or its supervision, through March 22, 2020, and as extended during any period that the Breaching

Employees have breached their obligations to JLT, from soliciting or endeavoring to cause JLT employees with whom any Breaching Employee came into contact for business purposes or about whom any Breaching Employee obtained Confidential Information to leave employment with JLT;

(d) Enjoining and restraining NFP, and any person or entity acting in concert with NFP or under its supervision, from possessing, using, disclosing or disseminating JLT's confidential information;

(e) Enjoining and restraining NFP, and any person or entity acting in concert with NFP or under its supervision, from any other actions in violation of any Breaching Employee's contractual obligations or fiduciary duties owed to JLT;

(h) Awarding compensatory damages and interest to JLT in an amount to be determined at trial;

(i) Awarding exemplary and punitive damages; and

(j) Granting JLT its costs and disbursements incurred in connection with this litigation, including attorneys' fees, together with such other further relief as the Court may deem just and proper.

Dated: May 1, 2019
      New York, New York
                                           */s/ Shawn Matthew Clark*
                                           A. Michael Weber
                                           Shawn Matthew Clark
                                           LITTLER MENDELSON, P.C.
                                           900 Third Avenue
                                           New York, NY 10022
                                           (212) 583-9600
                                           MWeber@littler.com
                                           SMClark@littler.com

                                           *Attorneys for Plaintiff*